2019 IL App (1st) 190441-U

THIRD DIVISION
December 31, 2019

No. 1-19-0441

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant/Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 88 CR 18817-01 |
| | ) | |
| JAMES MARSHALL, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellee/Cross-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; the trial court properly found defendant's petition for postconviction relief failed to allege a freestanding claim of actual innocence where defendant used the same evidence to support a claim of a violation of his constitutional rights at trial; defendant was not culpably negligent in filing the petition outside the time limitations of the Post-Conviction Hearing Act, and the trial court's judgment granting the petition based on newly discovered evidence of systemic physical abuse by police to coerce statements was not against the manifest weight of the evidence.

¶ 2    In February 1991 following a bench trial in the circuit court of Cook County James

Marshall, defendant, was convicted, of first degree murder and sexual abuse for the death of

defendant's 14-year-old stepdaughter Theresa.  In September 1993 this court affirmed

defendant's conviction and sentence.  In February 2017 defendant filed an initial petition for

postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). The trial court advanced defendant's petition to a third-stage evidentiary hearing. After the evidentiary hearing, the trial court granted defendant's petition for postconviction relief in part, vacated defendant's conviction, and remanded for a new hearing on defendant's motion to suppress his confession to the crime charged. The State appeals the trial court's judgment that defendant was not culpably negligent in failing to timely file his initial petition for postconviction relief, permitting defendant to amend his initial petition to add a claim of actual innocence, failing to dismiss the petition based on *laches*, and in granting the petition based on a pattern and practice of coercing confessions at the police station where defendant confessed. Defendant cross-appeals the trial court's judgment defendant failed to state a claim for actual innocence.

¶ 3    For the following reasons, we affirm the trial court's judgment.

¶ 4                                    BACKGROUND

¶ 5    Given the nature of the proceedings we begin with defendant's 2017 petition for postconviction relief. A Special Master found that defendant had a valid claim of police brutality under Jon Burge or officers under his command and forwarded the matter to the trial court to appoint counsel to represent defendant in postconviction proceedings. The petition states that the State convicted defendant in 1991 for "crimes he did not commit" and that defendant has consistently maintained that "his civil rights were violated during his 'interrogation' at Area 3" police headquarters in Chicago. Defendant alleged he was denied his right to remain silent and to an attorney, and he was physically and mentally tortured by detectives under the direct supervision of Jon Burge. Defendant's petition states that after more than 24 hours at Area 3 "detectives claim that [defendant] gave a court reported statement" confession to the murder and

sexual assault. Defendant stated he filed a motion to suppress his confession before his trial but at the time "evidence of police misconduct under Burge and his subordinates did not exist." Defendant alleged that evidence has "now come to light" that detectives involved in investigating the crime for which defendant was convicted were part of a group of Area 3 detectives who "routinely employed systematic torture" during interrogations. Defendant's petition states this confession is the only evidence of his guilt and it "was the product of an environment so violative of [defendant's] constitutional rights that no other option exists but to grant post-conviction relief."

¶ 6 Defendant's petition states that the confession was not produced in discovery. The petition recounts the investigation into Theresa's death, his pretrial motion to suppress, and the trial based on the police reports, testimony at the pretrial proceedings and trial, and defendant's own affidavit. We will summarize only those allegations in the petition necessary to an understanding of the issues on appeal. Theresa's unidentified body was discovered in an alley on November 7, 1988 at around noon. Barbara Quinn, Theresa's mother, called police at approximately 7:00 p.m. that night because she could not find Theresa. Later that night Quinn identified a photograph of the body discovered in the alley as Theresa. After Quinn identified Theresa's body to patrol officers, detectives Michael Duffin, Thomas Ptak, Victor Breska, and Lee Almaza went to the apartment Quinn and Theresa shared with defendant. Breska and Almaza took defendant to the morgue to identify the body while Ptak and Duffin remained with Quinn. Defendant identified Theresa at the morgue, then detectives took him to Area 3.

¶ 7 The petition further alleges, in pertinent part, that once they arrived at Area 3, defendant was placed "in a cold interrogation room on the third floor with a window open." A short time later "several detectives" (unnamed in the petition) came in, held defendant down, and hit him in

the face and body. Two of the detectives (still unnamed) left the room and went outside with guns drawn. At that time three detectives remained in the third-floor interrogation room. Two of them allegedly held defendant out of the window and threatened to drop him while the third drew his gun and told defendant the detective would say he and the men outside saw defendant trying to escape so they shot him. Defendant was pulled back inside and left alone in the room. Later, "Area 3 detectives also made [defendant] strip naked and give up his clothing." Defendant received a "paper suit to wear" and was forced to "sit in the cold interrogation room with the window open." Sometime later detectives brought defendant clothing from home and had him change out of his paper suit. The petition does not name any of the detectives who participated in the acts described above.

¶ 8    Defendant's initial petition for postconviction relief goes on to allege that "Area 3 detectives also handcuffed [defendant] to the wall and interrogated him while his hand was cuffed to the wall." At least four times, one detective would enter the room, write something on a legal pad, and ask defendant if that was how the murder happened and to sign the pad. Defendant refused to sign, the first detective would leave, and "two other detectives would enter and punch and kick [defendant.]" Defendant denied any involvement in Theresa's murder and denied having sex with her and at one point asked for an attorney, telling the detectives he did not wish to speak to them anymore. The petition alleges the detective responded by telling defendant he would not get defendant an attorney but he could get defendant a priest. Defendant was also told detectives would give Quinn a gun and allow her to shoot defendant. Again, the petition fails to name any of the detectives who allegedly committed these acts.

¶ 9    Defendant alleges detectives drove him around and asked defendant to identify where he disposed of the murder weapon. Defendant refused to get out of the car out of fear detectives

would claim he was trying to escape and shoot him. They returned to Area 3. Seemingly upon their return two detective entered the interrogation room "and talked about obtaining an electrical device" which they "threatened to use [on defendant's] testicles." The petition states detectives never showed defendant an electrical device and never used one on him. Also, at some point defendant told an assistant state's attorney (ASA) who entered the interrogation room "about the abuse he endured." The petition alleges this unnamed ASA "walked out of the interrogation room, stood outside the door and repeated loudly to the detective standing outside the door everything [defendant] had told him."

¶ 10    Defendant's petition for postconviction relief alleges that defendant "was never advised of his *Miranda* rights and the interrogation continued even after [defendant] stated that he no longer wanted to talk to police and that he wanted an attorney." The petition states that whatever defendant told police and the ASA "was the result of torture." According to the petition a detective and an ASA described a signed confession at defendant's trial but defendant's postconviction counsel has been unable to locate a copy of the confession. The petition states that according to transcripts of the trial a detective testified that defendant gave an oral statement to an ASA and that an ASA read this "purported signed confession" into evidence at the trial. Defendant's petition argues these purported statements conflict with the physical evidence and witness testimony and are "so inherently inconsistent that there is no other conclusion that they were coerced and are false."

¶ 11    Defendant told his attorney what happened at Area 3. Defendant's attorney eventually filed a motion to suppress defendant's statements. According to the petition the motion to suppress stated, in pertinent part, as follows: " 'At the police station [defendant] was interrogated by members of the Chicago Police Department who he believes to be detectives T.

Ptak ***; M. Duffin ***; L. Almanza ***; V. Breska ***; R. Vallandigham ***; R. Kocan ***; and D. Taylor ***.' " The motion to suppress stated defendant was not informed of his *Miranda* rights, the interrogation continued after defendant stated he did not want to speak and wanted an attorney, and the statements "were obtained as a result of coercion, threats and physical beatings that included threats of being thrown out of a window and being beaten upon by numerous police officers." The motion argued defendant's statements were obtained because of the physical and mental state defendant was placed in, because defendant was unable to understand his *Miranda* rights, and were not made voluntarily and knowingly. The postconviction petition posits the names in the motion likely came from an 11-page police report because defendant did not know and would not have been able to identify by name the officers who allegedly beat him. The petition states that Ptak, Duffin, Almaza, Breska, Kocan, Taylor, Vallandigham, and ASA John Dillon testified at the hearing on the motion to suppress defendant's statements. The petition alleged the city of Chicago "concealed evidence *** that Burge and the detectives under his command, including many of the detectives involved in the death investigation of Theresa Quinn, engaged in systematic torture, physical abuse, official misconduct or deception during interrogation of suspects at Areas 2 and 3."

¶ 12    The petition, in addition to recounting the detectives' and Dillon's testimony—which denied all of defendant's pertinent allegations—at the hearing on the motion to suppress, argues, in part, that Ptak's testimony at the suppression hearing is conflicting and notes the alleged inconsistencies. The petition also states that Detective Vallandigham testified he was assigned to the case on November 7, 1988. Detective Vallandigham testified that after ASA Dillon completed taking defendant's statement defendant identified a paddle as the murder weapon.

Dillon testified at the suppression hearing that defendant told Dillon police treated him well. Defendant did not testify.

¶ 13    At the conclusion of the hearing on defendant's motion to suppress the trial court denied the motion finding that defendant received his *Miranda* rights and freely and voluntarily gave up his right to remain silent and voluntarily gave the confession.  Defendant's case proceeded to a bench trial.

¶ 14    The petition for postconviction relief argues that the primary evidence against defendant was his statements to police and those statements are "contradictory improbable and were not corroborated by any other physical evidence or eyewitness testimony."  The petition also argues the trial did not include evidence that detectives under the command of Jon Burge, "including many of the detectives involved in the death investigation of Theresa Quinn," engaged in systematic torture during interrogations of suspects at Area 2 and 3 because "the existence of the systemic torture and abuse was covered up and hidden from [defendant] and thus not available to offer."  According to the petition, defendant's attorney conceded that defendant had sex with the victim and murdered her, despite defendant telling his attorney about the alleged torture and the fact defendant maintained his innocence.

¶ 15    At the trial, Detective Breska testified that defendant told Breska that his van stalled on the morning of November 7, 1988 as he was driving Quinn and two neighbors to work. Defendant allegedly told Breska he stayed home and fixed the van while Quinn and the neighbors continued on to work.  According to Breska, defendant stated he went to buy auto parts and returned home at approximately 11:00 a.m.  Upon his return defendant discovered a note from the telephone company stating they had been at his apartment.  Breska testified defendant stated he then continued to work on the van.  The petition states that Detective Ptak

testified that defendant told Ptak that defendant stayed at the auto parts store until 1:30 p.m. working on his van. Police recovered a receipt from the auto parts store with a time stamp of 1:14 p.m. on November 7, 1988. Ptak testified that during his questioning of defendant Ptak confronted defendant with the different information defendant had given another detective about the auto parts store. According to Ptak defendant told Ptak defendant forgot he came home at 11:00 a.m. and found the note from the telephone company.

¶ 16    The petition contains a stipulation entered at defendant's trial regarding Detective Duffin's testimony. At the trial the parties stipulated that if called to testify Duffin would testify that on November 7, 1988, he saw three pieces of wood with writing on them in the garbage can behind defendant's residence. Then, as a result of a conversation with Detective Vallandigham the next day, Duffin recovered the wood from the garbage can. An analyst for the Chicago Police Department also testified at defendant's trial that the pieces of wood were once part of one larger stick. The analyst testified he found hair fragments in the middle piece that had the same characteristics as Theresa's hair and fibers in on one of the pieces that was the same type of material and color as the carpet in defendant's van. Another witness testified he performed Theresa's autopsy, Theresa died of strangulation, and the doctor matched the wound on Theresa's neck to the pieces of wood. The petition also states that Vallandigham testified at defendant's trial as to defendant's alleged statement confessing to killing Theresa during an argument after they had consensual sex.

¶ 17    The postconviction petition states that defendant did not testify at trial. The defense called one witness who testified none of the samples taken from Theresa's body tested positive for semen. The petition argues that during the State's closing arguments at defendant's bench trial the prosecutor "conceded the contradictory, inconsistent and improbable nature of the

alleged confession." The petition asserts the prosecutor asked the trial judge "to believe some of the confession and ignore other parts of the confession. *** In fact, the State asked the Judge to look in between the lines of the confession and to take the confession with a grain of salt."

¶ 18    The trial court found defendant guilty of first degree murder and aggravated criminal sexual assault.

¶ 19    Defendant's postconviction petition goes on to argue that his statements are too contradictory, inconsistent, and improbable to be reliable. The petition claims the only evidence introduced at defendant's trial linking defendant to the murder and sexual assault was defendant's "alleged oral statement to Vallandigham and [defendant's] court reported statement." However, the petition argues that a comparison of the court reported statement and Vallandigham's testimony regarding defendant's alleged oral statement reveals that "the alleged confession was so nonsensical that it must have been fabricated by the Area 3 detectives from the torture they inflicted on [defendant.]" One alleged inconsistency in the written statement pertains to the time defendant allegedly claimed to have had sex with Theresa. The written statement says that defendant called his employer to report the problem with the van at 10:30 a.m. before he encountered Theresa and they had sex but also that he and Theresa had sex at approximately 7:30 a.m. Another inconsistency is an omission from the alleged oral statement to Vallandigham which did not include defendant returning to the apartment twice before having sex with Theresa, which is included in the written statement, or anything about a phone call to defendant's employer. (The petition points out other alleged omissions from the oral statement to Vallandigham of matters that are contained in the written statement.) The petition also notes the lack of evidence of sexual penetration.

¶ 20    Moreover, in the court reported statement defendant allegedly stated that when he and Theresa began to fight she grabbed a knife but defendant did not tell Vallandigham Theresa grabbed a knife. The written statement states defendant carried Theresa's body to the van which was parked in the alley but earlier in the statement defendant stated the van was parked on the street and does not state defendant moved the van. The written statement, oral statement to Vallandigham, oral statement to ASA Dillon, and the testimony of a witness also contradict as to when and where defendant disposed of the wooden pieces and Theresa's property. The written confession is internally inconsistent in that it both states that defendant disposed of some of Theresa's property after dumping her body in an alley and that defendant disposed of the same property before he left the apartment with Theresa's body still in the back of the van; and the written statement conflicts with the statement to Vallandigham in that defendant allegedly told Vallandigham he disposed of the property when he was on his way home after placing Theresa's body in an alley and then driving to the auto parts store—the written statement contains no mention of a trip to the auto parts store.

¶ 21    Defendant's initial petition for postconviction relief also argues that no physical evidence or eyewitness testimony links him to the crimes, and the conflicts in the testimony calls its veracity into question as well as that of the alleged confessions. Further, the petition complains about the performance of defendant's trial counsel both before and during trial. Defendant's conviction was affirmed on appeal. The initial postconviction petition argues that since then, "overwhelming evidence has gradually emerged that the violations of [defendant's] civil rights that led to [defendant's] false confession were part of a larger pattern of torture, beatings and civil rights violations by numerous Area 3 detectives under the command and direction of Area 3 Commander Jon Burge." The petition asserts: "Because Burge, as commanding officer,

condoned and directly participated in acts of torture and physical abuse of suspects, detectives under his supervision came to believe that they could torture and physically abuse suspects with impunity."

¶ 22    Defendant's initial postconviction petition repeats the allegation from defendant's pretrial motion to suppress that the statements the State introduced against defendant were the only evidence of his involvement in the crimes charged and those statements resulted from coercion, threats, and physical beatings. According to the petition, "[n]umerous Area 3 detectives under Burge's command that were involved in the investigation and interrogation of [defendant] have been accused, implicated and otherwise found to have participated in the horrific abuses and torture at Area 3. These officers include Detectives Paladino, Breska, Almaza, Ptak, Duffin, and Vallandigham." Defendant's petition summarizes the allegations of torture that have been made and/or found to be credible involving these detectives, which in the sole interest of brevity we will not repeat here. The petition alleges that many of the same techniques others accused the detectives of using on them were used on defendant. Specifically, the petition states: "The torture and misconduct in other cases by Burge and Detectives Paladino, Breska, Almaza, Ptak, Duffin, and Vallandigham occurred both before and after they tortured [defendant,] and many of these descriptions in other cases are similar to how they treated [defendant]" including physical abuse, being handcuffed to the wall, denying requests for a lawyer, being driving to different locations, threats of electric shock, threats with a gun, having clothing taken away and being left in a cold room, and threats of being thrown out and actually being held out a window.

¶ 23    The petition also notes that detectives "Paladino, Ptak, and Duffin have been accused of falsifying police reports, coercing witness testimony, and otherwise fabricating evidence" and argues that "in light of the accusations against Duffin fabricating evidence, there can be little

doubt that Duffin did not in fact find the paddle pieces behind [defendant's] apartment on November 8, 1988, as he reported." Defendant states:

> "Comparing [defendant's] allegations of abuse to those of other suspects who were abused at Areas 2 and 3 by detectives under the command of Jon Burge demonstrates that [defendant] was subjected to the same practice of torture and abuse at Area 3 as those other suspects. The detectives in [defendant's] case were highly motivated to coerce a confession and to otherwise fabricate inculpatory evidence given the lack of eyewitnesses, fingerprints, DNA, and evidence of sex, let alone sexual assault. A review of the trial testimony, the evidence, the police reports and the history of the officers involved in [defendant's] case leaves no doubt that not only were [defendant's] alleged confessions and subsequent conviction the result of abusive coercion and misconduct by Area 3 detectives, but that *[defendant] neither killed nor sexually assaulted Theresa Quinn*." (Emphasis added.)

¶ 24     Finally, the initial postconviction petition alleges that defendant's failure to file it within the time required by law was not due to his culpable negligence, "but rather due to the fraud, concealment, perjury, and cover-up of the systematic pattern and practice of torture at Area 3 by Burge, Paladino, Breska, Almaza, Ptak, Duffin and Vallandigham, and other officers working at Areas 2 and 3." Defendant asserted that newly discovered evidence of this pattern and practice, and newly issued findings and decisions based on that evidence, "came to light and was thus unavailable to [defendant] at his trial, appeal, and during the time frame in which he had to file a post-conviction petition." Defendant argued that fundamental fairness defeats any procedural

bars because of the fraud, concealment, perjury, and cover-up of the systematic pattern and practice of torture at Area 3." The claims for relief stated in the initial petition are:

1. Defendant's confession was involuntary, secured in violation of [defendant's] rights under the fourth, fifth, and fourteenth amendments to the United States Constitution, and in violation of Article I, Sections 2 and 10 of the Illinois Constitution of 1970.

2. Defendant was denied a fair trial by the withholding of impeaching and exculpatory evidence.

3. The cumulative effect of defendant's allegations deprived defendant of a fair trial.

4. Defendant received ineffective assistance of counsel at trial.

5. Defendant received ineffective assistance of counsel on direct appeal.

¶ 25    The State filed a motion to dismiss the initial petition on the grounds the petition was untimely, the petition is barred by *res judicata* and waiver, and the claims are "each deficient in substantive consideration." The trial court denied the State's motion to dismiss defendant's initial postconviction petition and the petition proceeded to a third-stage evidentiary hearing. The witnesses at the evidentiary hearing included Gerald Reed, who testified that in 1990, detectives Ptak and Duffin took him to Area 3 where he was handcuffed to the wall in a chilly room on the third floor. He was later interrogated by Detectives Kill and Breska. Reed testified Breska kicked him in the leg and back after Reed fell to the floor when his chair collapsed. Reed had a metal rod in his right leg which was discovered to be cracked after his interrogation. Reed testified he signed a statement that was not true.

¶ 26    During the evidentiary hearing the State moved to strike defendant's testimony related to a purported actual innocence claim in the initial postconviction petition because, the state argued, "[t]here is no actual innocence claim in the postconviction petition that's been pled." The State

argued defendant had to replead his petition to allege actual innocence and "start over at Stage 1." The State also demanded defendant identify the newly discovered evidence that would permit him to proceed with a claim of actual innocence. Defendant's postconviction attorney responded it was clear from their initial pleadings that defendant was claiming actual innocence and the newly discovered evidence was "the pattern and practice evidence, which under *People vs. Tyler* is new evidence that supports an actual innocence claim." Defendant's attorney conceded that actual innocence was not "a freestanding claim separated by a count" but actual innocence had "been part of this case since the very beginning."

¶ 27    After a short recess during which the trial court reviewed the initial petition and the State's motion to dismiss the court stated: "While I believe that the petition could fairly be read to include actual innocence with respect to the reading of the individual paragraphs and collectively, I do not believe that it is necessarily—that it necessarily comports with Illinois pleading requirements, particularly for a petition filed by counsel." The court ruled that the defense would be allowed to file an amended petition but "because I *** read [the initial petition] to include an actual innocence claim, I will not entertain a motion to dismiss."

¶ 28    Defendant filed an amended petition for postconviction relief adding as a separate claim for relief a claim of actual innocence. The amended petition states defendant "did not have any sexual contact with Theresa Quinn and did not kill Theresa Quinn. He is innocent of the charges for which he was convicted." The amended petition further alleges as follows:

> "The afore-described newly discovered findings, decisions, admissions
> and evidence of systematic torture and abuse, and constitutional violations of
> suspects by detectives under the command of Jon Burge at Areas 2 and 3 in the
> 1970's, 1980's and 1990's, and newly discovered evidence that ASA John Dillon

has been complicit in the wrongful conduct of Chicago police officers in their efforts to secure wrongful convictions, is new, material and noncumulative evidence that is so conclusive that it would change the result on retrial."

The amended petition alleged the evidence was new because it was discovered after defendant's trial and could not have been discovered sooner through the exercise of due diligence and is conclusive because it—

"would lead to a different result at trial when considered with: the lack of any signs of sex on the victim and lack of any blood, skin, or fingerprints found on the alleged murder weapon; the inconsistent and contradictory nature of the alleged confessions; [defendant's] nonguilty plea; and [defendant's] allegations that he had been abused and the confession coerced."

The amended petition prayed for a new trial with defendant's confession barred from evidence or, alternatively, a new hearing on the admissibility of his alleged confession.

¶ 29    The State filed an answer and affirmative defenses to defendant's amended postconviction petition. The State's affirmative defenses to the amended postconviction petition were that:

1. The amended petition is untimely and fails to allege the delay was not due to defendant's culpable negligence because the facts relating to Area 3 were fully disclosed in July 2006.

2. The amended petition is barred by *laches* because the delay in filing the petition has prejudiced the State where several of the key witnesses are now deceased.

3. The amended petition fails to allege newly discovered evidence to support a freestanding claim of actual innocence but merely alleges purportedly newly discovered evidence to attack

his confession and, regardless, defendant's claim of actual innocence should be reviewed and proceed through the first two stages of the postconviction process.

4. The amended petition fails to sufficiently allege a claim for a *Brady* violation.

¶ 30    Following the hearing and arguments the trial court issued a written order granting defendant's amended petition for postconviction relief.  Defendant had testified at the evidentiary hearing that he first learned of abuse occurring at the hands of officers under the command of Jon Burge in approximately 2005 when an attorney came to his correctional facility to talk to defendant about a different inmate's case.  That attorney showed defendant pictures of detectives and defendant did not recognize anyone in those pictures.  Addressing the timeliness of defendant's petition the trial court's written order finds that "some evidence suggests [defendant] was actually apprised that other prisoners were making similar claims by the mid-2000s."  The court noted defendant's testimony that he spoke to an attorney regarding his treatment in 2004 or 2005 and defendant "produced an affidavit about his treatment in police custody in support of Grayland Johnson's 2007-filed petition."

¶ 31    The trial court found defendant could be faulted for not filing his own petition sooner but that fault "is more like mere negligence, not culpable negligence within the meaning of the [Post-Conviction Hearing Act.]"  The trial court also noted that when "defendants have consistently claimed their confession was the result of physical coercion *** our higher courts have allowed defendants to proceed on such claims over procedural barriers."  Regarding defendant's coercion claim the court made several pertinent factual determinations:

1. Detective Paladino has been implicated in numerous allegations of abuse but defendant never specifically accused Paladino of abusing him and the hearing evidence shows Paladino's only involvement in investigating this crime was "going to the scene where

Theresa's body was found, obtaining a photograph, and distributing it at the 9th District station."

2. Defendant specifically accused Vallandigham of abusing him but "there is comparatively little pattern evidence regarding Vallandigham."

3. "Similarly, the pattern evidence for Detectives Breska, Almaza, Ptak, and Duffin is comparatively thin."

4. However, defendant's "interrogation *** occurred at the same location, Area 3, and time period as other claims of torture. The manner of abuse and methods employed are also very similar to other claims ***."

5. And, "although the individual detectives do not have lengthy records of abuse allegations, some have been named in significant cases." (Noting cases filed against Detectives Breska, Ptak, Almaza, and Duffin.)

6. Defendant "has consistently claimed he was abused while in police custody."

The trial court concluded:

"In this case, while the pattern evidence does not perfectly line up—there are no other instances of the exact same officers doing the exact same things to other suspects—[defendant's] claim is sufficiently similar in time, place, and manner to make the detective's rote, unexplained denials [at the suppression hearing that defendant was abused] difficult to accept. For these reasons, the Court finds [defendant] has made a substantial showing that the outcome of his suppression hearing likely would have differed had the officers' testimony [at that hearing] been subject to impeachment based on a pattern of abusive tactics.

>          Accordingly, [defendant's] conviction shall be vacated for a new suppression
>
>          hearing and, if necessary, a new trial."

¶ 32    Turning to defendant's actual innocence claim the trial court noted that defendant relied upon this court's decision in *People v. Tyler*, 2015 IL App (1st) 123470 to argue that evidence of a pattern and practice of police misconduct along with a claim a confession was coerced is sufficient to establish actual innocence but found that the remark on which defendant relied "is inconsistent with our supreme court's precedent." The trial court found that for purposes of defendant's claim of actual innocence "the inquiry is not whether the State could meet its burden without the confession." In this case the court found evidence that "is so conclusive that no reasonable juror would convict" to be lacking. The court found the inconsistencies defendant noted between his statement and the trial evidence to be "minor discrepancies" that "often appear in criminal trials" and further noted that "matters intrinsic to the confession or in trial evidence could not qualify as newly discovered." The court held it believed defendant had in fact made the statement and that it was not persuaded the salient facts in the statement were false. The court found other evidence implicated defendant in the crimes charged and that based on the court's review of the testimony and the evidence defendant "has not made a substantial showing of actual innocence." However, the court noted, that finding "is neither here nor there for our current purposes" because use of a defendant's physically coerced confession as substantive evidence is never harmless error. The court granted the petition for postconviction relief "with respect to [defendant's] claim that newly discovered evidence would have likely altered the outcome of his suppression hearing."

¶ 33    This appeal followed.

¶ 34                                    ANALYSIS

¶ 35    The State appeals the trial court's judgment granting defendant's postconviction petition based on his claim his constitutional rights were violated because he was convicted based on an involuntary confession that was obtained by physical and psychological abuse. "The Post–Conviction Hearing Act [(Act)] (725 ILCS 5/122-1 *et seq.* (West 2000)) provides a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. [Citation.] To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006).

"Since a postconviction petition is a collateral attack on a judgment, any issue actually previously raised at trial or on direct appeal is *res judicata*. [Citations.]

However, the doctrine of *res judicata* is relaxed 'where fundamental fairness so requires' or 'where the facts relating to the issue do not appear on the face of the original appellate record.' [Citation.] The doctrine of *res judicata* is also 'relaxed' if the defendant presents substantial new evidence. [Citation.] 'The standards addressing when new evidence is sufficiently substantial so as to relax *res judicata* are the same standards used to determine whether newly discovered evidence should result in a new trial.' [Citation.] Thus, for new evidence to be sufficient to relax *res judicata* and warrant an evidentiary hearing, ' "the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such

character that the defendant in the exercise of due diligence could not have discovered it earlier." ' [Citations.]" *People v. Tyler*, 2015 IL App (1st) 123470, ¶¶ 157-158.

¶ 36    The grounds for the State's appeal in this case are that defendant's petition is time-barred under the statute and the doctrine of *laches*. The State also argues on appeal that the trial court erred in permitting defendant to amend his postconviction petition to allege a claim for actual innocence without affording the State an opportunity to challenge the petition's actual innocence claim before proceeding to an evidentiary hearing. Defendant filed a cross-appeal of the trial court's judgment denying him postconviction relief based on his claim of actual innocence. The relief for defendant's claim that his confession was involuntary and obtained in violation of his constitutional rights, if warranted, is to remand for a new suppression hearing and then, only if necessary, a new trial. See *People v. Whirl*, 2015 IL App (1st) 111483, ¶¶ 80, 110. If defendant has satisfied the criteria to warrant relief based on a claim of actual innocence the proper relief will be to order a new trial where defendant's "newly discovered evidence" of his actual innocence can be weighed against the State's evidence of defendant's guilt. See *People v. Ortiz*, 235 Ill. 2d 319, 337 (2009). Because the relief differs for each claim, and because a successful claim based on actual innocence would require a new trial obviating the need for a remand for a new suppression hearing, we will address each argument in turn beginning with defendant's appeal of the denial of his postconviction petition based on actual innocence.

¶ 37                                  1. Actual Innocence Claim

¶ 38    A freestanding claim of innocence based upon newly discovered evidence is cognizable under the Act. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Relief under the Act based on a freestanding claim of actual innocence requires that "the supporting evidence be new, material,

noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial. [Citations.]" (Internal quotation marks omitted.) *Id.*

> "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 66.

The trial court should consider whether the new, material, and noncumulative evidence "places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *People v. Coleman*, 2013 IL 113307, ¶ 97. "But the trial court should not redecide the defendant's guilt in deciding whether to grant relief" on a claim of actual innocence. *Id.*

> "Indeed the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. *** Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. [Citation.]" *Id.*

¶ 39 "[T]he evidence being relied upon to support a freestanding claim of actual innocence cannot be used to supplement an assertion of a constitutional violation with respect to defendant's trial. [Citation.]" (Internal quotation marks omitted.) *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 30. See also *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008)

("Freestanding claims of innocence contemplate that the newly discovered evidence is not also being used to supplement the assertion of another constitutional violation with respect to the trial."), citing *People v. Washington*, 171 Ill. 2d 475, 479 (1996). This court reviews the trial court's decision following an evidentiary hearing to deny relief on a claim of actual innocence for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. "Manifest error is 'clearly evident, plain, and indisputable.' [Citation.] Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident. [Citation.]" *Id.*

¶ 40     Defendant argues his case is "indistinguishable" from the facts present in *Tyler*, 2015 IL App (1st) 123470, ¶ 200, and that under *Tyler*, defendant's newly discovered evidence of systemic police misconduct suffices to support *both* defendant's torture claim and the actual innocence claim.

¶ 41     In *Tyler*, the defendant was convicted of first degree murder based on the defendant's confession to acting as "security" during the shooting and an eyewitness identification of defendant running in the area carrying a gun at the time of the shooting. *Tyler*, 2015 IL App (1st) 123470 ¶ 1. Before the trial the defendant filed a motion to suppress his confession asserting in part that "due to physical coercion *** his statements were not voluntary, knowingly, and intelligently made." (Internal quotation marks omitted.) *Id.* ¶ 8. Following an evidentiary hearing the trial court denied the defendant's motion to suppress and the defendant's case proceeded to a jury trial. *Id.* ¶ 10. At trial the State's evidence included the defendant's confession and the testimony of a witness who stated she heard gunshots and then saw the defendant and a codefendant running down an alley "each with a gun in their hand." *Id.* ¶ 18. The defendant testified in the defense case that at the time of the shooting he was playing video games and otherwise spending time at various locations with two friends he only knew by their

nicknames at the house of another friend who did testify at defendant's trial. *Id.* ¶ 27. The defendant testified that after he turned himself in to police and was questioned at the police station detectives hit him in the chest and face. *Id.* ¶ 28.

¶ 42 After the defendant signed his written confession he was taken to the hospital "because his chest hurt and he was vomiting blood." *Id.* ¶ 29. The defendant's known friend testified consistently with the defendant's testimony that he and two others he also only knew by nickname were playing video games and otherwise spending time together at the time of the shooting. *Id.* ¶ 31. In rebuttal the State elicited the testimony of the doctor who treated the defendant when police took defendant to the hospital after defendant signed his confession. *Id.* ¶ 31. The doctor testified from his medical records that the defendant "had a history of hematemesis, 'which means a history of vomiting blood.' " *Id.* The doctor testified that from his medical records he did not observe any redness or bruising on the defendant's face or chest at the time. *Id.* The jury found the defendant guilty of first degree murder. *Id.* ¶ 40.

¶ 43 The defendant in *Tyler* filed a direct appeal and ultimately an amended petition for postconviction relief. *Id.* ¶¶ 42-46. The pertinent issues raised in the defendant's amended petition for postconviction relief were (1) a claim actual innocence, "based on the recanted testimony of [the eyewitness,] new affidavits of alibi witnesses, new medical testimony showing defendant was beaten, and new evidence of police misconduct;" and (2) a claim "police physically coerced [defendant's] confession." *Id.* ¶ 47. The defendant's "actual innocence claim relied on four pieces of newly-discovered evidence:

> (1) the affidavit of [the eye witness], recanting her trial testimony; (2) the
> affidavits of [two new witnesses], corroborating defendant's alibi at trial; (3) the
> report of an expert witness, Dr. Fiona Gallahue, concerning defendant's

hematemesis diagnosis; and (4) a collection of evidence of police misconduct, including 90 exhibits containing affidavits, complaints, newspaper articles, and other cases in which other defendants alleged abuse by Detectives Kenneth Boudreau, James O'Brien, John Halloran, Michael Clancy, William Foley, and William Moser. [The defendant] also attached the affidavit of Julie Hull, who testified to the connection between defendant's case and M.W.'s criminal case and civil lawsuit (*Wiggins v. Burge*, 173 F.R.D. 226 (N.D.Ill.1997))." *Id.* ¶ 48.

¶ 44 The eyewitness who identified defendant as running in the area at the time of the shooting with a gun in his hand "averred that she testified falsely at [the] defendant's trial that she observed [the] defendant in the gangway near her house on March 29, 1994, and that she testified falsely because of 'intense pressure' from the police." *Id.* ¶ 54. The eyewitness "identified James O'Brien, John Halloran, and Kenneth Boudreau as the detectives whom she spoke with during the investigation and prior to trial." *Id.* ¶ 55. The two new alibi witnesses who provided affidavits were the individuals the defendant previously only knew by nickname. In his amended postconviction petition the defendant averred that he identified those two individuals and they provided affidavits to corroborate his alibi but those affidavits were not available to the *Tyler* court. *Id.* ¶ 57. The defendant similarly averred that an expert witness opined that the defendant's hematemesis "is consistent with [the] defendant's allegation of being beaten on his chest" but the expert's affidavit was also not available to the *Tyler* court. *Id.* ¶ 59. Finally, as it pertains to this appeal, the defendant in *Tyler* also "attached 90 exhibits containing numerous affidavits, complaints, and parts of cases and appellate decisions concerning other defendants, including codefendants, who alleged abuse by Detectives Michael Clancy, William Moser, and other officers." *Id.* ¶ 61.

¶ 45   The *Tyler* court focused on claims concerning Detectives Clancy and Moser and listed the claims made against them. *Id.* ¶¶ 61-78. The *Tyler* court also discussed the affidavit of the Cook County Assistant Public Defender who represented the defendant in his direct appeal. *Id.* ¶ 80. The assistant public defender (APD) averred she first met defendant as a witness in a case involving another client, a minor. *Id.* The *Tyler* defendant eventually provided exculpatory testimony for the minor but had initially been afraid to testify because the minor had told the defendant he had been tortured by police. *Id.* ¶ 82. The trial court suppressed the APD's  minor client's statement but that decision was reversed on appeal; the minor later filed a civil suit and won. *Id.* ¶¶ 83, 88. The APD averred she learned that detectives who were defendants in the minor's civil suit were also involved in the defendant's case. *Id.* ¶ 87. Defendant argued in his postconviction petition that these detectives used the murder in *Tyler* "to 'pay back' [the] defendant for exposing their previous conduct" and to retaliate against him. *Id.* ¶ 89.

¶ 46   The State filed a motion to dismiss the defendant's postconviction petition in pertinent part on the ground "that defendant's claim of actual innocence was not freestanding and was improperly used to supplement assertions of constitutional violations, and that defendant's new evidence did not show actual innocence." *Id.* ¶ 92. The trial court granted the State's motion to dismiss in part. *Id.* ¶ 94. As it pertains to this appeal the trial court in *Tyler* dismissed the defendant's claim of actual innocence. *Id.* ¶ 94. The trial court found that the defendant's constitutional rights were not violated and that his confession was voluntary. *Id.* ¶ 99. The trial court also found that the affidavits of the two additional alibi witnesses were not new evidence because the witness who testified at the defendant's trial identified the two additional potential alibi witnesses by name in his trial testimony. *Id.* ¶ 97. The defendant's claims based on the recantation of the eyewitness and based on an alleged *Brady* violation for failing to disclose that

the State paid the eyewitness's relocation expenses proceeded to a third-stage evidentiary hearing. *Id.* ¶ 101. At the evidentiary hearing the eyewitness, who testified via videotaped evidence deposition, recanted her statements in her affidavit and stated that she testified truthfully at the defendant's trial. *Id.* ¶¶ 105-114. The investigator for the defendant testified in rebuttal to the eyewitness's evidence deposition. *Id.* ¶¶ 122-33.

¶ 47 Following the evidentiary hearing the trial court dismissed the remaining claims in the postconviction petition. *Id.* ¶ 135. Despite having stated that the trial court dismissed the defendant's actual innocence claim before an evidentiary hearing (*id.* ¶¶ 94, 99) the *Tyler* court wrote that after the evidentiary hearing the trial court next "rejected [the] defendant's actual innocence claim."[1] *Id.* ¶ 136. The trial court allegedly resolved the actual innocence claim based on a credibility determination between the eyewitness's recantation of her affidavit and the investigator's testimony concerning the securing of that affidavit. *Id.* ¶¶ 136-37. The *Tyler* defendant appealed the dismissal of his postconviction petition. *Id.* ¶ 138. According to the opinion in *Tyler* the defendant's appeal raised as separate issues "(1) whether defendant is entitled to a third-stage evidentiary hearing on his alleged coerced confession claim; [and] (2) whether [the eyewitness's] testimony at defendant's prior evidentiary hearing demonstrates his actual innocence and warrants a new trial." *Id.* ¶ 140. The *Tyler* court reversed and remanded "for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing

---

[1] The *Tyler* court later wrote that:

> "The trial court advanced defendant's actual innocence claim based on Andrea Murray's recantation and defendant's *Brady* violation claim based on the State's failure to disclose relocation expenses paid to Murray to the third stage, and it dismissed defendant's other claims at the second stage. The trial court then dismissed the actual innocence claim and alleged *Brady* violations after hearing the evidence at the third-stage evidentiary hearing." *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 148.

on [the] defendant's coerced confession claim" and affirmed the dismissal "of all of [the] defendant's other claims." *Id.* ¶ 141.

¶ 48     The *Tyler* court first addressed the defendant's claim that the trial court erred in dismissing his claim that detectives obtained an involuntary confession through physical abuse. *Id.* ¶ 154. The court began with the trial court's finding that the defendant's coerced confession claim was barred by *res judicata*." *Id.* ¶ 156. The court found that *res judicata* is relaxed "if the defendant presents substantial new evidence" and that "for new evidence to be sufficient to relax *res judicata* and warrant an evidentiary hearing, the evidence *** must be of such conclusive character that it will probably change the result on retrial ***." (Internal quotation marks omitted.) *Id.* ¶ 158. Thus, the *Tyler* court considered whether the defendant's "evidence of systemic police abuse *** would have changed the result at trial" (*id.* ¶ 164) for purposes of determining whether *res judicata* should be relaxed as to that claim. See *id.* ¶¶ 155-64. The court found it had no way of determining the truth of the defendant's allegations that the detectives involved in his case were involved in the "longstanding pattern of systemic abuse" the defendant later discovered and also physically abused the defendant in *Tyler*, or if the detectives who interrogated the defendant were involved in other claims of physically beating suspects to obtain confessions, and it was for that reason the *Tyler* court remanded for an evidentiary hearing. *Id.* ¶ 164.

¶ 49     The *Tyler* court concluded that if the evidence of systemic police abuse had been "available to [the] defendant and he presented it at trial, it could have reasonably undermined the detectives' credibility." *Id.* ¶ 186. The court wrote that the "evidence of systemic abuse by these detectives *** could have created a different result" and, additionally, evidence of the defendant's injuries after he confessed and the "testimony that [the] defendant was playing video

games *** at the time of the crime raises a serious doubt as to [the] defendant's guilt ***." *Id*. Accordingly the court held *res judicata* did not bar consideration of the evidence of systemic police abuse. *Id*. ¶ 188. The court held the defendant made a substantial showing of a constitutional violation in that "a longstanding pattern of police misconduct *** could have resulted in his coerced confession and support his claim of actual innocence" (*id*. ¶ 189) and remanded for a third-stage evidentiary hearing on that claim (*id*. ¶ 193).

¶ 50    Next, the court turned to defendant's claim of actual innocence, which was "based on [the eyewitness's] affidavit recanting her testimony at trial." *Id*. ¶ 195. The defendant argued the trial court "improperly evaluated his actual innocence claim because it considered the evidence of the [witness's] recantation alone and not in conjunction with the other evidence he cited in support of his claim." *Id*. ¶ 198. The defendant "originally cited the following evidence in support of his actual innocence claim: (1) [the eyewitness's] affidavit recanting her trial testimony; (2) affidavits of two additional alibi witnesses; (3) [the expert's] medical affidavit; and (4) evidence of systemic police misconduct." *Id*. ¶ 198. The *Tyler* court found the medical expert's affidavit was not new evidence and the two additional alibi witnesses' testimony would be cumulative. *Id*. ¶ 199. The court held the defendant was "entitled to have the evidence of systemic police misconduct considered by the trial court in an evidentiary hearing." *Id*. ¶ 200. The court noted that the standard for relaxing *res judicata* is nearly identical to that of actual innocence, thus, "[f]or the same reasons we discussed earlier, the evidence of systemic police misconduct is new, material, noncumulative, and is so conclusive it could reasonably change the result on retrial. As a result, the evidence of systemic police misconduct is sufficient to support [the] defendant's claim of actual innocence." *Id*.

¶ 51    The *Tyler* court addressed the trial court's finding that " 'the newly discovered evidence [the] [defendant] points to *** is being used to supplement his assertion of a constitutional violation with respect to trial.' " *Id.* ¶ 201.  The court held "although defendant presented this evidence in his constitutional claim that his confession was coerced, the evidence is not being used to merely supplement the constitutional claim since the evidence supports a showing of actual innocence on its own because defendant claims that his confession was not voluntary." *Id.* ¶ 202.  The *Tyler* court presented this conclusion without further analysis of how, in that case, an allegedly involuntary confession supports a showing of "actual innocence."  See *id*.  Rather, the court repeated the conclusion that "[a]s such, this evidence supports a freestanding claim of actual innocence, and [the] defendant is entitled to have the evidence considered in an evidentiary hearing." *Id*. ¶ 202.  In this case, defendant specifically relies on this holding in *Tyler* to support his claim the trial court erred in denying his actual innocence claim in defendant's amended postconviction petition.

¶ 52    However, the trial court in this case found that *Tyler* is inconsistent with our supreme court's decision in *People v. Hobley*, 182 Ill. 2d 404 (1988).  Defendant argues the trial court "was not empowered" to choose not to follow *Tyler* and instead to apply *Hobley* and regardless, the trial court "read *Hobley* too broadly."  In *Hobley*, our supreme court stated as follows:

> "A 'free-standing' claim of innocence means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.'  See *Washington*, 171 Ill. 2d at 479.  For example, in *Washington*, a witness came forward years after the defendant's conviction and stated that two other men had committed the murder for which the defendant was convicted, and that she had not come forward sooner

out of fear for her life. *Washington*, 171 Ill. 2d at 477-78. This newly discovered evidence was deemed sufficient to grant relief. *Washington*, 171 Ill. 2d at 489-90." *Hobley*, 182 Ill. 2d at 443-44.

¶ 53 *Hobley* involves an appeal from the trial court's judgment granting the State's motion to dismiss the defendant's second-amended petition for postconviction relief. *Hobley*, 182 Ill. 2d at 410. In *Hobley*, the defendant was convicted of felony murder, arson and aggravated arson based on "charges related to an arson fire in which seven persons died and several other persons were injured." *Hobley*, 182 Ill. 2d at 410. "Experts for both the State and the defense agreed that the fire was intentionally set with gasoline." *Id*. at 412. A witness testified he observed the defendant purchase gasoline from a station near the fire, then later saw the defendant standing outside near the fire. *Id*. at 412-13. Detectives testified the defendant confessed to intentionally starting the fire. *Id*. at 415. That same day another detective was told to return to the fire scene and "locate a gasoline can" which he did. *Id*. at 416. The State introduced the two-gallon gasoline can the detective located at the scene into evidence at the defendant's trial. *Id*. A detective testified that black powder on the can introduced into evidence was fingerprint powder and that the can had been sent to the crime lab for fingerprint testing. *Id*. at 416. At the conclusion of the State's case the defendant moved for a mistrial on the ground the State failed to disclose that a fingerprint analysis had been performed on the two-gallon gasoline can or the results of that analysis. *Id*. at 418. The State denied that a fingerprint report existed and the trial court denied the defendant's motion for a mistrial. *Id*.

¶ 54 Defendant testified and denied confessing to starting the fire. *Id*. Defendant also testified that detectives physically and verbally abused him. *Id*. at 422. The defense attempted to elicit expert testimony concerning the two-gallon gasoline can the State entered into evidence but the

trial court refused to allow the defendant's expert to testify. *Id*. at 425. The defendant made an offer of proof that his expert would testify that he examined the can and pictures of the can taken at the scene. *Id*. at 425. "The photos revealed that the can was clean and in excellent condition when photographed." *Id*. The expert would testify that given the condition of the gasoline can it had not been near any heavy fire or smoke. *Id*. at 425-26.

¶ 55 After the trial the jury found the defendant guilty of felony murder, arson, and aggravated arson. *Id*. at 426. The defendant filed a petition for postconviction relief and, ultimately, a second-amended petition for postconviction relief (petition). *Id*. at 427. The petition alleged the State committed a *Brady* violation by suppressing a fingerprint report on the two-gallon gas can it entered into evidence at the defendant's trial and when it suppressed a second gasoline can found at the scene that the State allegedly destroyed after the defense demanded that it produce the second can. *Id*. at 428-29. The materials attached to the defendant's postconviction petition revealed that the defendant's investigator learned that two gas cans had been in the possession of the State related to the defendant's case. *Id*. at 430. One of the two cans was destroyed, based on the order of one of the detectives who investigated the defendant's case, less than one month after the defense issued a subpoena to the crime lab. *Id*. at 431. The defendant's petition also alleged that the investigation revealed the existence of a fingerprint report on the two-gallon gasoline can entered into evidence in the defendant's trial and that the report states that the results of the fingerprint tests were negative, and the existence of a record stating that a one-gallon gasoline can containing debris was recovered from the scene of the fire. *Id*.

¶ 56 The defendant contended "that the State violated *Brady* by suppressing (1) the negative fingerprint report on the gasoline can that it introduced against him at trial, and (2) a second gasoline can found at the fire scene." *Id*. at 431-32. The *Hobley* court concluded that the

defendant was entitled to an evidentiary hearing on his *Brady* claims. *Id.* at 433. The court concluded that "[t]he trial record and defendant's post-conviction petition clearly support his claims that, despite his pretrial requests for production, the State failed to disclose to him the existence of two pieces of exculpatory evidence: (1) a report that defendant's fingerprints were *not* on the gasoline can introduced against him at his trial, and (2) a second gasoline can found at the fire scene." (Emphasis in original.) *Id.* at 433.

¶ 57    The newly discovered evidence the defendant in *Hobley* claimed provided "compelling evidence that he is actually innocent of the arson and murders for which he stands convicted" included the same negative fingerprint report on the two-gallon gasoline can and the second one-gallon gasoline can found at the fire scene. *Hobley*, 182 Ill. 2d at 443. Thus, in *Hobley*, where our supreme court had "already held that the State's actions regarding the fingerprint report and second gasoline can may establish a violation of [the] defendant's constitutional right to due process under *Brady*," the same newly discovered evidence did "not support a 'free-standing' claim of actual innocence. Rather, the newly discovered evidence [the] defendant points to here is being used to supplement his assertions of constitutional violations with respect to his trial. Defendant has therefore not properly raised a claim of actual innocence under *Washington*." *Hobley*, 182 Ill. 2d at 444.

¶ 58    In this case defendant argues the evidence of systemic abuse "does not merely supplement" defendant's claim the State violated his constitutional rights;" rather, "it shows conclusively that an innocent man was imprisoned." Defendant denies that he is attempting to support a free-standing claim of actual innocence with evidence of a constitutional violation. Defendant argues the evidence of systemic abuse "conclusively shows his innocence" because without the confession the State is incapable of meeting its burden to prove defendant guilty

beyond a reasonable doubt. Defendant specifically asserts that "examining all the evidence presented at trial, with the new evidence of systemic abuse, unmistakably shows that [defendant] is actually innocent" because the "only evidence linking [defendant] to the murder was the statement," the State will be unable to prove the statement was voluntary, therefore "[t]here being no other evidence of guilt, [defendant] is actually innocent." Defendant argues this court in *Tyler* "correctly held that the same evidence that is used to support a claim that a constitutional violation occurred at trial can be used to support a claim that the State is unconstitutionally imprisoning an innocent man."

¶ 59    We reject defendant's reading of the holding in *Tyler* both because it is a misstatement of the law and because we believe it is not an accurate reflection of the *Tyler* court's rationale. First, the law is clear that the same evidence that is used to establish a violation of a defendant's constitutional rights at trial cannot also be used to support an allegedly "free-standing" claim of actual innocence. *Hobley*, 182 Ill. 2d at 444. See also *Gonzalez*, 2016 IL App (1st) 141660, ¶ 30. In *Gonzalez*, this court found that the defendant was "offering newly discovered evidence— Guevara's pattern of coercing, improperly influencing, and intimidating witnesses in other cases—to supplement his assertion that the State committed a *Brady* violation in this case, while at the same time using this evidence to support his claim of actual innocence." *Gonzalez*, 2016 IL App (1st) 141660, ¶ 30. The court held this was "impermissible because 'the evidence being relied upon to support a freestanding claim of actual innocence' cannot be 'used to supplement an assertion of a constitutional violation with respect to defendant's trial.' *People v. Brown*, 371 Ill. App. 3d 972, 984 (2007). As a result, [the defendant's] actual innocence claim fails." *Gonzalez*, 2016 IL App (1st) 141660, ¶ 30. In *Brown*, the court held that an affidavit was "being used by [the] defendant to assert ineffective assistance of counsel claims with respect to his trial.

Therefore, it cannot also be used to support a free-standing claim of actual innocence." *Brown*, 371 Ill. App. 3d at 984, *overruled on other grounds*, *People v. Young*, 2018 IL 122598, ¶ 31.

¶ 60    The situation is the same here. In this case, defendant is offering newly discovered evidence—a pattern of systemic physical abuse of African-American men at Area 3 police headquarters to solicit false confessions to crimes—to supplement his assertion that Area 3 detectives physically abused defendant to solicit a false confession from him, while at the same time using this evidence to support his claim of actual innocence. Because this is impermissible, defendant's actual innocence claim must fail. Second, we do not believe the holding in *Tyler* is contrary to this well-established law.

¶ 61    The *Tyler* court found that "[f]or the same reasons we discussed earlier [in connection with its resolution of the *res judicata* issue,] the evidence of systemic police misconduct is new, material, noncumulative, and is so conclusive it could reasonably change the result on retrial. As a result, the evidence of systemic police misconduct is sufficient to support [the] defendant's claim of actual innocence, and the trial court erred when it did not advance this *evidence* to a third-stage evidentiary hearing." (Emphasis added.) *Tyler*, 2015 IL App (1st) 123470, ¶ 200. We note that the *Tyler* court expressly remanded the case "for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing on [the] defendant's coerced confession claim" (*id*. ¶ 244), not on the defendant's actual innocence claim based on the eyewitness's recantation (*id*. ¶ 195). See *id*. ¶ 244. We also note that the "reasons discussed earlier" in that case included evidence of systemic abuse and, additionally, evidence that defendant had visible physical injuries after he signed his confession and a witness who provided defendant with an alibi for the crime. See *id*. ¶ 186. When it "discussed earlier" whether the evidence likely "would have changed the result at trial" the *Tyler* court found that the evidence

of the defendant's injuries and that he had an alibi "raises a serious doubt as to [the] defendant's guilt when we consider that the detectives involved have a history of claims of police brutality." *Id*. ¶ 186. Even if the *Tyler* court intended that the defendant would be able to proceed on his actual innocence claim it is not clear that claim would be based on the evidence of systemic abuse alone, which was used to support a separate claim of a constitutional violation as in the case *sub judice*.

¶ 62    The decision in *Tyler* does not clearly stand for the proposition that evidence supporting a claim of a constitutional violation (the defendant's coerced confession) may, alone, also support a claim of actual innocence. Rather, the court's decision may simply reflect the well-established rule that when a postconviction petitioner properly raises a claim of actual innocence, based, for example, on a recanted eyewitness's testimony as was actually the case in *Tyler*, the trial court is to consider all of the available evidence to determine whether the newly discovered evidence is likely to change the result of the trial. See *Coleman*, 2013 IL 113307, ¶ 97. In determining whether newly discovered evidence would probably change the result on retrial, the trial court is to predict "what another jury would likely do, *considering all the evidence*, both new and old, together." (Emphasis added.) *Id*.

¶ 63    This understanding of the holding in *Tyler* is bolstered by the *Tyler* court specifically holding that the evidence was not "merely" being used to supplement the constitutional claim (*Tyler*, 2015 IL App (1st) 123470, ¶ 202) and that the defendant was "entitled to have the evidence of systemic police misconduct considered by the trial court in an evidentiary hearing" where the trial court had "considered the evidence of [the] *recantation* alone and not in conjunction with the other evidence [the defendant] cited in support of his claim" ((Emphasis added.) *Tyler*, 2015 IL App (1st) 123470, ¶¶ 198, 200).

¶ 64    In *Tyler*, the defendant raised a claim of actual innocence independently (based on a recantation) of the evidence supporting his alleged constitutional violation (based on coercion). The *Tyler* court's holding is reasonably understood to stand for no more than the fact the trial court should not have considered the recantation in isolation, but should have considered it "in light of all of the evidence" that would be available on retrial—which would include evidence of systemic police abuse.  See *Supra*, ¶ 49, citing *Tyler*, 2015 IL App (1st) 123470, ¶ 186.

¶ 65    In this case, defendant has not raised a clam of actual innocence independently (defendant has cited no other grounds) of his claim of a constitutional violation (based on coercion).  Accordingly, *Tyler* is, in fact, inapposite.  The trial court found that *Tyler* did not apply because it is inconsistent with *Hobley*, and the trial court applied *Hobley* instead.  The trial court was right that *Tyler* does not apply in this case, but we think for the wrong reason.  That is inconsequential.  "An appellate court is not constrained by the reasoning of the trial court and may affirm the dismissal of a postconviction petition on any basis supported by the record." *People v. Stoecker*, 384 Ill. App. 3d 289, 294 (2008).  Defendant is attempting to use the same evidence that forms the basis of his claim his constitutional rights were violated at trial to argue that he is actually innocent.  This, he may not do.  The trial court correctly dismissed the actual innocence claim in defendant's amended postconviction petition and its judgment in that regard is affirmed.  In light of this holding, we have no need to address the State's argument the trial court should not have permitted defendant to amend the petition to add an actual innocence claim in the first place, though we note the trial court was well within its discretion to do so.  *People v. King*, 192 Ill. 2d 189, 193-94 (2000).

¶ 66                              2. Coerced Confession Claim

¶ 67    We now return to the State's arguments defendant's amended petition is time barred and fails to allege newly discovered evidence of a pattern and practice of abuse by the detectives involved in his interrogation. Section 122-1 of the Act provides as follows:

> "[N]o proceedings under this Article shall be commenced more than 6 months from the date for filing a *certiorari* petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a defendant does not file a direct appeal, the post-conviction petition shall be filed no later than 3 years from the date of conviction, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.
>
> This limitation does not apply to a petition advancing a claim of actual innocence." 725 ILCS 5/122-1(c) (West 2016).

Defendant's amended petition alleges that defendant's failure to file the petition within the time required by law was not due to his culpable negligence, "but rather due to the fraud, concealment, perjury, and cover-up of the systematic pattern and practice of torture at Area 3 by Burge, Paladino, Breska, Almaza, Ptak, Duffin and Vallandigham, and other officers working at Areas 2 and 3." Defendant further asserted that the vast majority of newly discovered evidence of this pattern and practice, and newly issued findings and decisions based on that evidence, was unavailable during the time frame in which he had to file a postconviction petition. Defendant's petition also argued that fundamental fairness defeats any procedural bars because of the "fraud, concealment, perjury, and cover-up of the systematic pattern and practice of torture at Area 3."

¶ 68    We consider defendant's coercion claim and his actual innocence claim separately for purposes of determining whether the petition is timely under the Act. See *People v. Evans*, 2017 IL App (1st) 143268, ¶ 24. Defendant does not dispute that he filed his petition outside the time

required by the Act. Thus, we can only consider defendant's coercion claim if defendant "demonstrates that his late filing was not due to his culpable negligence." *Id.* ¶ 26. "Culpable negligence is 'something greater than ordinary negligence and is akin to recklessness.' [Citation.] To show a lack of culpable negligence, a defendant must present allegations of specific fact showing why his tardiness should be excused ([citation]); vague or conclusory assertions will not suffice ([citation])." *Id.* ¶ 26. "A trial court's findings of fact regarding a defendant's culpable negligence will not be reversed unless manifestly erroneous, but the trial court's ultimate conclusion as to whether the established facts demonstrate culpable negligence is reviewed *de novo*. [Citation.]" *People v. Johnson*, 2015 IL App (2d) 131029, ¶ 27.

¶ 69    "[T]his court [has] found petitioners to be culpably negligent for filing a petition 27 months late ([citation]) and 40 months late ([citation])." *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 30. However, "a lack of culpable negligence—not time—is the inherent element." *People v. Wright*, 189 Ill. 2d 1, 8 (1999) ("As a lack of culpable negligence permits the filing of a post-conviction petition regardless of the length of time that has passed, a lack of culpable negligence—not time—is the inherent element."), overruled on other grounds by *People v. Boclair*, 202 Ill. 2d 89 (2002). " '[W]hether delay is due to culpable negligence depends not only on when the claim is discovered [by the defendant] but [also] on how promptly the defendant takes action after the discovery.' [Citation.]" *People v. Ramirez*, 361 Ill. App. 3d 450, 453-54 (2005), citing *People v. Davis*, 351 Ill. App. 3d 215, 218 (2004). "Our supreme court has made clear that it is imperative to construe 'culpable negligence' broadly so as to ensure that defendants will not be unfairly deprived of the opportunity to have their constitutional claims adjudicated." *People v. Hobson*, 386 Ill. App. 3d 221, 232 (2008). "The petitioner carries the

burden of establishing that a delay in filing a postconviction petition was not the result of his culpable negligence." *People v. Van Hee*, 305 Ill. App. 3d 333, 336 (1999).

¶ 70    In this case, the trial court's factual finding was that "some evidence suggests [defendant] was actually apprised that other prisoners were making similar claims by the mid-2000s." That finding is not manifestly erroneous because, as the trial court further stated, "[defendant] said he spoke with Greenlees[, an attorney representing Grayland Johnson, a different torture victim,] in 2004 or 2005. [Defendant] produced an affidavit about his treatment in police custody in support of Grayland Johnson's 2007-filed petition." Nonetheless, defendant delayed even further beyond 2005 and did not file his initial petition until 2017. The trial court determined these established facts did not demonstrate culpable negligence. We review the trial court's determination *de novo* (*Johnson*, 2015 IL App (2d) 131029, ¶ 27), meaning we conduct the same analysis the trial court would conduct (*Tyler*, 2015 IL App (1st) 123470, ¶ 151).

¶ 71    Of the time period between his discovery of evidence of systemic abuse at Area 3 and the fact others were filing claims based on the pattern and practice of some detectives to physically coerce false confessions from African-American men and the filing of his own petition over 140 months later, defendant only argues that the Act does not permit a construction under which the limitations period re-engages at some point after the statutory period has ended. We construe defendant's argument to imply that culpable negligence is only measured by the facts within the limitations period stated in the Act and once that period expires without culpable negligence on the part of the defendant the petition can be filed at any time. Defendant cites no authority for this reading of the Act. In *Davis*, the defendant advocated for "applying a discovery rule in determining the timeliness of a postconviction petition." *Davis*, 351 Ill. App. 3d at 217. Under the defendant's reading of the Act in that case, "the three-year period for filing a postconviction

petition should begin when the defendant learns of his claim." *Id*. at 218. In rejecting that argument the court reasoned as follows:

> "Section 122-1(c)'s exception for delay that is not due to culpable negligence undoubtedly covers cases of delay that are an unavoidable consequence of the late discovery of a claim. To accept defendant's argument, however, we would have to further hold that a defendant is never guilty of culpable negligence as long as he does not wait more than three years to file his postconviction petition after the discovery of a claim. To the contrary, whether delay is due to culpable negligence depends not only on when the claim is discovered but on how promptly the defendant takes action after the discovery. Thus, even though defendant may not have discovered his claim until about nine months after his conviction, it cannot be said that he was free from culpable negligence where he then waited for over two years before filing his petition."
>
> *Davis*, 351 Ill. App. 3d at 218.

This court has recognized that "[t]he decision in *Davis* further indicates that courts should look at the actions of the defendant after discovering a postconviction claim." *People v. Bumpers*, 379 Ill. App. 3d 611, 619 (2008) appeal denied, judgment vacated and cause remanded "for an evidentiary hearing, allowing the State to refute [the] defendant's allegations denying culpable negligence in the untimely filing of his post-conviction petition," 229 Ill. 2d 632 (2008).

¶ 72 Despite the fact we must look to "the actions of the defendant after discovering a postconviction claim," on appeal defendant has offered nothing in that regard. However, defendant's amended petition does state that since the completion of his motion to suppress hearings, "evidence has gradually emerged that the violations of [defendant's] civil rights ***

were part of a larger pattern of torture, beatings and civil rights violations \*\*\*." The previous unavailability of evidence in support of a postconviction claim has been found to demonstrate a lack of culpable negligence in the petitioner for failing to file sooner. See, *e.g.*, *People v. Knight*, 405 Ill. App. 3d 461, 466 (2010) (finding "delay in filing the petition was not due to [the] defendant's culpable negligence" in part because "the petition alleges that defendant's witnesses were previously unwilling to testify and asserts that the witnesses who averred that defendant was not involved in the murder are only now willing to come forward because gangs no longer control the prison."). Defendant filed his initial postconviction petition in February 2017. In support of his petition defendant cites several decisions by this court issued as late as 2016. Attached to the amended petition is a complaint in federal district court naming ASA Dillon as a defendant that was filed in April 2017. Defendant's memorandum in support of the admission into evidence of exhibits in support of his petition lists as exhibits a response to a subpoena from the city of Chicago in September 2016; transcripts of testimony by Jon Burge from June 2010, May 2014, and October 2016; deposition testimony by detective Paladino from July 2004 and January 2014; testimony by other alleged victims from May 2004, March 2008, July 2011, April 2013, and March 2015; and the July 2006 report of the Special State's Attorney. Further, while defendant did complete an affidavit in support of a 2007-filed petition about his treatment in police custody, he had attempted to raise that claim on his own behalf before to no avail, and the Presiding Judge of the Criminal Division of the Circuit Court of Cook County did not appoint the Special Master to identify valid claims of torture by officers under the command of Jon Burge until 2014. Defendant was not appointed counsel for the purpose of pursuing such a claim until 2017.

¶ 73    Neither party has directly addressed how long a defendant may continue to gather evidence in support of their postconviction claim before filing a petition[2], and we will not decide that question.  For purposes of this appeal, the petition and record demonstrate that defendant was not indifferent to his claim nor did he disregard the consequences of the delay in filing his postconviction petition.  Defendant's conduct—gathering additional evidence as it gradually emerged between 2004 and February 2017—does not evince "an indifference to, or disregard of," his claims, nor can we say defendant "willfully disregarded the process of the court."  See *Boclair*, 202 Ill. 2d at 106-07.  Regardless, in light of defendant's allegations and the evidence that has emerged over time, we find that "the interest of justice is best served" by allowing defendant to proceed with his postconviction claim.  See *People v. Nicholas*, 2013 IL App (1st) 103202, ¶ 47.  We make this finding "in consideration of the most serious allegations of police misconduct raised by defendant."  *Nicholas*, 2013 IL App (1st) 103202, ¶ 44 (and cases cited therein).

¶ 74    For this reason, the State's argument grounded in *laches* also fails.  The State argues that defendant's delay in filing his petition has prejudiced it because it can no longer call several witnesses and because defendant "dramatically changed the allegations of abuse" by Detective Vallandigham.  We do not agree with the State's characterization of the difference between defendant's allegations at the motion to suppress hearing—that he was threatened with being held out a window—and defendant's allegations in his petition—that he actually was held out a window—as a "dramatic change."  Our supreme court has recognized that "where fundamental fairness so requires, strict application of procedural bars may be relaxed."  *People v. Flores*, 153

[2]    Our supreme court's decision in *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72 (1995), cited in a footnote by the State, does not involve the Act and is, therefore, inapposite.

Ill. 2d 264, 274 (1992). *Laches* is an equitable doctrine (*People ex rel. Alvarez v. Gaughan*, 2016 IL 120110, ¶ 14) and as such, "its application is controlled by equitable considerations" (*First National Bank of Colorado Springs v. McGuire*, 184 F.2d 620, 626 (7th Cir. 1950)). *Laches* "cannot be invoked to defeat justice, and can be applied as a defense only where the enforcement of the asserted right would work injustice." *McGuire*, 184 F.2d at 626. See also *People v. Cathey*, 2019 IL App (1st) 153118, ¶ 21.

¶ 75      In this case, we find fundamental fairness requires relaxation of the *laches* doctrine because to fail to do so would work an injustice where defendant has not been culpably negligent in pursuing his claim police tortured him into giving a false confession. See *Nicholas*, 2013 IL App (1st) 103202, ¶ 44 (and cases cited therein), see also *People v. Wrice*, 2012 IL 111860, ¶¶ 71-73 ( holding harmless error does not apply for purposes of cause and prejudice test for successive postconviction petition alleging the State used a physically coerced confession as substantive evidence of the defendant's guilt because "this type of coercion by the state *** constitutes an egregious violation of an underlying principle of our criminal justice system about which Justice White spoke—'that ours is an accusatorial and not an inquisitorial system.' [Citations.]"). We also note that the question here is merely whether the trial court should have allowed defendant's amended petition to proceed to an evidentiary hearing. As noted by our supreme court in *Wrice*, defendant was "yet required to establish the allegations set forth in his postconviction petition" and our holding "merely allows the petition to proceed; it does not relieve *** defendant of his evidentiary burden in the postconviction proceeding." *Wrice*, 2012 IL 111860, ¶ 85.

¶ 76      Apropos of the foregoing, we next address the State's argument the trial court erred in granting defendant's postconviction petition because defendant failed to allege or prove any

newly discovered evidence of a pattern or practice of physical abuse by the detectives actually involved in his interrogation. "Following an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 51. "Manifestly erroneous means arbitrary, unreasonable and not based on the evidence. [Citations.]" (Internal quotation marks omitted.) *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132. This court recently stated the proper inquiry when presented with claims of this type:

> "In light of the evidence of the pattern of misconduct presented at the evidentiary hearing, the questions are (1) whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and (2) whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result. [Citation.] The issue is not whether the confession itself was voluntary, 'but whether the outcome of the suppression hearing likely would have differed if the officer who denied harming the defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by that officer in the interrogation of other suspects.' [Citation.]" *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68 (citing *People v. Patterson*, 192 Ill. 2d 93, 145 (2000), *Whirl*, 2015 IL App (1st) 111483, ¶ 80).

¶ 77 The State argues defendant "did not allege or prove his newly discovered evidence would have probably changed" the result of the trial because defendant "identified only one officer by name as having used physical force against him—Richard Vallandigham" and defendant "presented no pattern evidence *** to impeach Vallandigham and Vallandigham is not listed in

the 'newly discovered evidence'—the Goldston Report and the Report of the Special State's Attorney." The State, relying on our supreme court's decision in *Patterson*, argues there is insufficient pattern and practice evidence against the detectives involved in defendant's interrogation to warrant relief.

¶ 78    In *Patterson*, the defendant filed a pretrial motion to suppress his statements on the grounds that "to obtain [his] confession, the police officers struck him, attempted to suffocate him, and threatened him with a gun." *Patterson*, 192 Ill. 2d at 104. The trial court denied the motion to suppress, the matter proceeded to trial, and the defendant was convicted of murder and sentenced to death. *Id*. at 102-104. The defendant filed a petition for postconviction relief "relying largely on evidence that numerous other people had made allegations similar to [the] defendant's about police brutality at Area 2" including "a report from [the Office of Professional Standards (OPS)]" finding "the abuse of prisoners at Area 2 was systemic." *Id*. at 106. The trial court granted the state's motion to dismiss the petition stating that "any nexus between Area 2 Chicago Police Department Headquarters' alleged systemic torture of people and [the defendant] is highly tenuous at best." (Internal quotation marks omitted) *Id*. at 106-07. The defendant argued he received ineffective assistance of counsel because his attorney should have investigated contemporaneous allegations of torture by codefendants and a witness. *Id*. at 109. Our supreme court found that a codefendant's motion to suppress did not identify the officers involved or describe with any particularity misconduct similar to what the defendant alleged. *Id*. at 110. The court found that "[w]ithout some evidence indicating that the same officers or supervisors were involved or that the same type of misconduct was involved, we have no basis upon which to conclude that this evidence was relevant to defendant's claims. " *Id*. at 110. Regarding the affidavits of a witness and another possible codefendant the court held that

"[b]ecause these allegations are quite different from defendant's, we are unable to conclude that they are relevant to defendant's claim." *Id.* The court concluded that after reviewing the evidence it could not "conclude that [the] defendant [had] demonstrated that, had [his attorney] interviewed these witnesses, a reasonable probability exists that the result of the suppression hearing would have been different." *Id.*

¶ 79    The defendant in *Patterson* also argued that his attorney erred in failing to inform the trial court of the similarities between his torture allegations and another defendant who had raised similar torture allegations, both involving Jon Burge. *Patterson*, 192 Ill. 2d at 114-15. Our supreme court noted that "[i]n past cases, this court has declined to find evidence of prior police brutality to be relevant when the defendant offered only generalized allegations of coercive activity at Area 2 ([citation]) and when the allegations of brutality were not similar and occurred three years before the case at bar ([citation])." *Id.* at 115, citing *People v. Orange*, 168 Ill. 2d 138, 150-51 (1995) and *Hobley*, 159 Ill. 2d at 312. After reviewing the defendant's allegations and the allegations of the other victim, our supreme court noted that their allegations were "not closely related in time." *Id.* at 118. The court recognized, however, that both "alleged that they had been punched, kicked, and suffocated" and that "Burge, while alone with each of them, used a revolver as a threat." *Id.* The court found that "[n]otwithstanding these similarities, we do not believe that a reasonable probability exists that, had defense counsel informed the trial court of these similarities, the trial court would have found this evidence admissible or that we would have reversed this decision on appeal." *Id.* at 118-19. The court concluded that "[b]ecause the information available at the time indicated that Wilson was mistreated for a reason wholly unrelated to defendant's case, and because the evidence identified only a single incident of

misconduct removed in time from defendant's, we believe that the evidence is too attenuated to be relevant." *Id*. at 119.

¶ 80    The defendant also argued that his trial counsel was ineffective for failing to introduce evidence that the defendant's confession was coerced. *Patterson*, 192 Ill. 2d at 120.  Our supreme court found that the defendant pleaded sufficient facts to demonstrate that trial counsel's decision not to present this defense fell below an objective standard of reasonableness. *Id*. at 121.  On the issue of whether the defendant was prejudiced the court found that the defendant had "pleaded sufficient facts to undermine confidence in the jury's verdict." *Id*. at 122.  The court reasoned as follows:

>  "The evidence against defendant consisted essentially of the testimony of police officers and assistant State's Attorneys stating that defendant had confessed.  During opening statements, defendant's attorney told the jury that they would hear evidence that defendant confessed only because the police beat him up and tried to suffocate him with a plastic bag.  Notwithstanding this promise, defense counsel chose to present no such evidence.  Although we are unable to conclude that, absent this failure, the result of the proceeding *would* have been different, we have no need to reach such a conclusion.  [(Emphasis in original.)  [Citation.]]  We need only determine that a reasonable probability exists that, had the evidence been present, the outcome would have been different. [Citation.]  We are, of course, unable to divine the course the jury would have taken if it had heard this evidence, but we believe that, under the factual circumstances of this case, the evidence is of such import that our confidence in the jury's verdict is undermined." *Id*. at 122-23.

¶ 81 Finally, as it pertains to the State's arguments, the defendant argued he was entitled to an evidentiary hearing "to present new evidence to support his claim that his confession was the result of torture." *Id*. at 138-39. This new evidence fell—

> "into four categories: (1) the OPS report finding that 'psychological techniques and planned torture' were 'systemic' and 'methodical' in Area 2 and that Burge actively participated in and supervised this torture; (2) appellate court decisions holding that Burge tortured Wilson and that Burge was properly fired for his role in torturing Wilson; (3) the discovery of 60 additional acts of torture from Area 2; and (4) the conclusion, by an expert on the psychological effects of torture, that defendant was tortured." *Id*. at 139.

¶ 82 First addressing the "newness" of the evidence our supreme court found that "60 additional acts of torture from Area 2" contained in a proffer prepared by the defendant's civil attorneys should be considered new evidence if the defendant could establish the later discovery of additional torture allegations linking his claims to those contained in the proffer. *Id*. at 140. The court found that even incidents that are remote in time can become relevant if there is evidence of other incidents in the interim. *Id*. "[A] series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture." *Id*.

¶ 83 The *Patterson* court also found the new evidence was material and, as pleaded, would likely change the result upon retrial. *Id*. at 145. In reaching that conclusion our supreme court noted that "[t]he question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations." *Id*. In *Patterson*, the court found that the defendant had—

"consistently claimed that he was tortured. In fact, he made this claim during his first court appearance. Moreover, defendant's claims are now and have always been strikingly similar to other claims involving the use of a typewriter cover to simulate suffocation. Additionally, defendant describes the use of a gun as a threat and beatings that do not leave physical evidence. Further, the officers that defendant alleges were involved in his case are officers that are identified in other allegations of torture. Finally, defendant's allegations are consistent with the OPS findings that torture, as alleged by defendant, was systemic and methodical at Area 2 under the command of Burge." *Id*. at 145.

Thus the court held that the defendant had presented sufficient evidence to entitle him to a hearing to determine "whether (1) any of the officers who interrogated defendant may have participated in systemic and methodical interrogation abuse present at Area 2 and (2) those officers' credibility at the suppression hearing might have been impeached as a result." *Id*.

¶ 84 In this case, the State argues defendant did not identify what information in the "newly discovered evidence" is relevant to his case, nor, apparently, can he, because "none of the detectives individually have pattern evidence that would satisfy *Patterson*. Defendant responds "[t]hese same detectives [who participated in torturing defendant] have now been shown to have regularly imposed the same torture methods on other people that they employed on [defendant.]" Defendant's brief notes the specific prior accusations, supported by exhibits to defendant's petition, against Detectives Duffin, Ptak, Paladino, Breska, Almaza, and Vallandigham. Defendant also argues that under *Tyler* and *Whirl*, evidence of past abuse by officers is relevant even if they are not the officers who abused defendant. Defendant argues he has offered more than "generalized allegations of coercive activity with no link to [his] case" as argued by the

State. Rather, defendant argues, he has presented evidence that the detectives who participated in his interrogation and the investigation of Theresa's murder had a practice of extracting confessions by unlawful coercion.

¶ 85    In *Tyler*, the State argued the defendant's evidence in that case did not warrant relaxation of *res judicata* because "it does not support [the] defendant's claim of abuse since they were not the detectives who allegedly beat him." *Tyler*, 2015 IL App (1st) 123470, ¶ 180. This court rejected that argument finding that—

> "each of these detectives played an active role in the investigation and it is
> claimed that their actions in concert resulted in defendant's conviction. Each of
> these detectives were listed on the police report as arresting officers. Since the
> vast majority of the cases presented by defendant involve allegations of police
> misconduct by two or more detectives, it is crucial to consider the claims of
> systemic pattern of abuse in the context of several officers working together to
> obtain a false confession in the case at bar." *Id*. ¶ 181.

The *Tyler* court found that if the evidence was available to the defendant at his trial it could have reasonably undermined the detectives' credibility. *Id*. ¶ 186. In *Whirl*, this court found that even if the evidence established only that a detective "stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether [that detective's] credibility may have been impeached as a result of this evidence." *Whirl*, 2015 IL App (1st) 111483, ¶ 103, citing *People v. Jakes*, 2013 IL App (1st) 113057, ¶ 32. And in *Jakes*, the State argued that the trial court correctly held that evidence of prior misconduct by a detective was irrelevant because the defendant in that case testified only that the detective

watched while another detective beat and threatened him but never stated that the first detective hit him. *Jakes*, 2013 IL App (1st) 113057, ¶ 32. This court held:

> "The State ignores the added coercive power that a second police officer brings to an enclosed interview room simply by watching while another officer brutally beats a suspect and verbally threatens to do worse. The officer's silent acceptance of the crime committed by a fellow officer can help persuade their victim that no one associated with police will help him and he will face worse beatings if he tells a police officer, an assistant State's Attorney, or a doctor working for the State about the beatings." *Id.*

¶ 86    We hold the trial court's judgment that defendant's claims are "sufficiently similar in time place and manner" to establish a pattern of abuse that, if available at the suppression hearing, might have impeached the detectives involved in his case, is not against the manifest weight of the evidence. Turning first to the State's argument that defendant only identified Detective Vallandigham as having used physical force against him, the State goes on to claim that at the evidentiary hearing, defendant "testified that Detectives Breska and Ptak did not abuse him." We find this to be a mischaracterization of defendant's testimony.

¶ 87    At the evidentiary hearing on defendant's initial postconviction petition, in pertinent part, defendant testified on cross-examination that several detectives, including Detectives Vallandigham, Breska, and Almaza, punched him repeatedly in a third-floor interrogation room at Area 3. Defendant was asked about the detectives' testimony at the hearing on the pretrial motion to suppress statements. Specifically, defendant was asked if he denied the fact that at the hearing on the motion to suppress Detective Ptak denied that anyone hit defendant, grabbed him around the neck, or punched him. Defendant answered, "He might have denied that, but he

wasn't the one that did that anyway." Defendant then clarified that it was not his testimony that Detective Ptak had nothing to do with the beating; defendant was testifying only that Detective Ptak was not the detective holding defendant around the neck. Defendant specifically testified "I'm *not* saying that he [(Detective Ptak)] didn't participate at all." (Emphasis added.) Defendant further clarified: "I'm just saying that grabbing me around the forehead in a headlock wasn't something that he did ***."

¶ 88    Defendant was also asked about Detective Duffin's testimony at the hearing on the motion to suppress where Duffin testified that defendant never asserted his right to remain silent and never asked for a lawyer. Defendant responded Detective Duffin and detectives who were in the interrogation room with Duffin "were not the detectives that I asked for an attorney, it was one of those that were in the room by himself ***." Defendant explained that he was in the interrogation room with one detective who asked defendant questions, an after the single detective asked him questions defendant asked for an attorney—but that single detective was not Detective Duffin. Defendant testified that when Duffin testified that defendant never asserted his right to remain silent or for an attorney Duffin did so incorrectly, without knowing the facts because Duffin was not present when defendant asserted those rights.

¶ 89    Defendant testified that Detectives Duffin's, Almaza's, and Ptak's testimony that no one hit defendant, or grabbed him around the neck, or hung him out a window, is not true. Defendant was asked about Detective Breska's testimony in which Breska denied putting defendant in a headlock or punching defendant or threatening to punch him and whether Breska's testimony was untrue. Defendant responded that testimony was true because Breska "did not do that." However, defendant testified that Breska's testimony that no one did that was not true. Defendant was then asked the following questions and gave the following answers:

"Q. Okay. Can you tell us, then, the names, if it's not Breska or Duffin or Almaza, the name of the individuals that you claim—

A. No, I'm not saying they didn't participate. I'm saying that they're all saying that—Breska is saying that he never put me in a headlock, it wasn't him that put me in a headlock.

Q. He's saying no one put you in a headlock.

A. He's saying that, but that's not true. *He participated in it* but he was not the one that put me in the headlock. Why would he discuss that when it wasn't what he was doing." (Emphasis added.)

¶ 90   Defendant further testified that Vallandigham "was the one that put me in the headlock." Defendant continued: "He [(Vallandigham)] was the first detective that actually put his hands on me in the detective station. He started the whole thing." Defendant agreed that Vallandigham is a name he remembers because Vallandigham was the detective who first physically abused him. (Defendant did not testify at that time that Vallandigham was the only detective he remembers who attacked him.) Defendant admitted that he knew the identities of some of the officers who abused him at the time of his trial in 1990 because he was present for their testimony at a hearing where the detectives denied that anyone abused defendant or denied defendant his rights. The State showed defendant a series of photographs and asked him if he recognized the individuals in the photos as one of the police officers who abused him. Defendant testified he could not recognize the individuals depicted in the photos and could not identify any of them as one of his abusers. Defendant testified "I'm not saying they weren't involved, I'm just saying I cannot identify them."

¶ 91    The trial court found Detective Breska "had [a] substantial role in the investigation related to [defendant] and was present for parts of the interrogation" and that "Detectives Ptak, Duffin, and Almaza are similar.  They interacted with [defendant] and were present during the first several hours he was in custody when he alleges the most abuse occurred."  That finding is not against the manifest weight of the evidence.  The State's assertion that defendant testified at the evidentiary hearing that Detectives Breska and Ptak "did not abuse him" is refuted by the record and would not bar defendant's claim that the result of his suppression hearing would have been different had defendant had evidence of their prior misconduct to impeach them.  See *Whirl*, 2015 IL App (1st) 111483, ¶ 103.

¶ 92    We also reject the State's argument defendant failed to cite newly discovered evidence that would make it more likely that the result of his suppression hearing would have been different.  The State argues defendant's evidentiary materials are not "new" because the Goldston Report was first published in 1998 and the report of the Special State's Attorney was "released 11 years prior to the 2017 filing of defendant's initial postconviction petition."  This argument fails.  We have already decided that the trial court's judgment that defendant was not culpably negligent in the delay in filing his initial petition was correct.  Regardless, defendant cites additional evidence to the Goldston Report and the report of the Special State's Attorney.  Notably, among other evidence defendant cited in support of his petition, the trial court found that "Gerald Reed's testimony [at the evidentiary hearing] offered another notable similarity" in that Reed described circumstances that "created an obvious scenario where detectives could stage an 'escape' as pretext to shoot him and avoid repercussion since they had a ready witness to say that's what happened."  The trial court concluded "[t]he threat to drop [defendant] from the window with detectives outside with guns drawn ready to shoot him for 'escaping' is the

same kind of intimidating tactic." The trial court also noted findings by the Torture Inquiry and Relief Commission (TIRC) and specific allegations by other victims against Detectives Breska, Ptak, and Almaza.[3]

¶ 93    The State also argues that defendant "failed to demonstrate the same officer or officers in his case were involved in similar methods of abuse which occurred at or near the time of defendant's allegations." The trial court's written order finds that defendant's "interrogation certainly occurred at the same location, Area 3, and time period as other claims of torture. The manner of abuse and methods employed are also very similar to other claims, albeit involving different detectives." Nonetheless, the trial court found the detectives involved in defendant's investigation "have been named in significant cases" involving abuse and that their participation in past abuse is relevant to their credibility. "[O]ur supreme court has noted that a series of incidents spanning several years can be relevant to establishing a pattern and practice of torture." *Whirl*, 2015 IL App (1st) 111483, ¶ 100 (citing *Patterson*, 192 Ill. 2d at 140). The trial court's findings are supported by the record.

¶ 94    For example, defendant's petition cites a memorandum opinion and order from the United States District Court for the Northern District of Illinois deciding a motion to dismiss a civil complaint against Detective Vallandigham, among others. The order states that in 1989 Vallandigham and other officers transported the plaintiff in that case to a police station where he was "beaten and forced to sign a false statement." The plaintiff in that case later "appealed and won a new trial, in which he was acquitted." Defendant points in the record to 2013 deposition

---

[3]    The trial court's order states: "The defense offered materials related to other claims of coerced confessions and abuse by detectives at Areas 2 and 3 under Burge. They are voluminous and need not be recounted here in detail. The material include reported decisions, findings by the TIRC commission, civil complaints, testimony in other post-conviction proceedings, and deposition testimony."

testimony in a civil suit against the city of Chicago where the deponent testified that in 1981 Duffin and Ptak were questioning him about a crime then "[t]hey started beating me up to make me say I saw it." An amended complaint against the city of Chicago filed in 2004 alleges Detective Paladino beat, tortured, and suffocated two other victims (not the plaintiff in the complaint), and that those examples of torture "are corroborated by sworn testimony." The latter occurred in 1985 and the former was the subject of sworn in-court testimony in 1983. Another civil complaint filed in 2010 accuses Detectives Almaza, Ptak, and Paladino of torturing the plaintiff in 1988 "with the intention of eliciting incriminating evidence." That complaint alleges "these officers[, including Ptak, Almanza [*sic*] and Paladino] succeeded in torturing a false confession from [the plaintiff's co-defendant]" who "falsely implicated [the plaintiff.]" A case disposition by the TIRC made as a finding of fact that in 1990 Detective Breska, during the course of an interrogation, "kicked the chair out from under [the prisoner] and repeatedly kicked [him] in the area of his right leg and lower back." The TIRC disposition also states:

> "While Breska's history *** is not as extensive ad that of [Detective] Kill, Breska is one of the detectives involved in the Eric Johnson case. In an Affidavit executed March 28, 2006, *** Johnson states that Breska punched him in the left ribs and repeatedly slapped him in the face.
>
> Kill and Breska have pled the 5th Amendment privilege against self-incrimination when questioned about physically abusing detainees."[4]

---

[4] In *Whirl*, this court wrote:

> "A postconviction proceeding, as a collateral attack on the judgment of conviction, is civil in nature. [Citation.] 'It is the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they

¶ 95    These are just some of the examples of newly discovered evidence implicating Area 3 detectives in systemic abuse of prisoners to coerce confessions.  Even if not specifically named, the evidence suggests other detectives "stood by and did nothing while other officers committed acts of torture and abuse, [and their] silent acceptance is still relevant to the issue of whether [those detectives'] credibility may have been impeached as a result of this evidence."  *Whirl*, 2015 IL App (1st) 111483, ¶ 103, citing *Jakes*, 2013 IL App (1st) 113057, ¶ 32.   We cannot say the trial court's judgment is manifestly erroneous.

¶ 96    We have no need to address defendant's remaining arguments.  The trial court's judgment is affirmed.

¶ 97                                        CONCLUSION

¶ 98    For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 99    Affirmed.

---

refuse to testify in response to probative evidence offered against them.' (Internal quotation marks omitted.)  [Citations.]

    We recognize that although a court may draw a negative inference from a party's refusal to testify, it is not required to do so.  Yet given that the State produced no evidence to rebut the evidence of torture and abuse by Pienta, we believe Pienta's invocation of his fifth amendment rights is significant and a negative inference should have been drawn.  Instead, when discussing the evidence that was presented at the suppression hearing, the trial court mentioned in passing that Pienta had taken the fifth amendment at the evidentiary hearing, but appeared to give more weight to the fact that the original judge had not found Whirl credible at the suppression hearing than to the fact that Pienta refused to testify at the evidentiary hearing."  *Whirl*, 2015 IL App (1st) 111483, ¶¶ 106-107.

We note that Detective Paladino invoked his fifth amendment rights during the evidentiary hearing on defendant's postconviction petition.